**Opinion issued September 1, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00968-CR

———————————

**STEPHEN FRANKLIN HEIMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 81031-CR**

---

## MEMORANDUM OPINION

A jury found appellant, Stephen Franklin Heiman, guilty of the offense of

capital murder.[1] Because the State did not seek the death penalty and appellant

was eighteen years or older when he committed the offense, the trial court, as

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a), (b).

statutorily required, assessed appellant's punishment at confinement for life, without parole.[2]   In two issues, appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in instructing the jury.

We affirm.

## Background

James Moore, a neighbor of the complainant, Don Weido, on Windy Shores Drive in the Shadow Creek subdivision in Brazoria County, Texas, testified that on the evening of January 22, 2017, he looked out his front window and noticed that a car had backed into the complainant's driveway and was parked diagonally, facing the street.  Moore thought this looked unusual and examined more closely the front of the complainant's home, which was across the street and one house over from his own.  Moore saw two individuals crouched over and walking toward the complainant's front door.  He asked his wife to call for emergency assistance and report that someone was trying to break into the complainant's home.  Meanwhile, Moore went out his back door and walked to the front of his house.  When he looked over at the complainant's house from this new vantage point, he saw that the car was gone and the complainant's front "door was sort of partially opened."

---

[2]    *See id.* § 12.31(a)(2).

Samuel Louis, another neighbor of the complainant, testified that he lived a couple of doors down and across the street from the complainant's home. On the evening of January 22, 2017, while he watching television, he heard "what [he] knew to be gunshots, approximately four gunshots." Louis "proceeded to the back door of [his] house going out to . . . see what this noise was and what was going on." His wife said she believed that the sounds had come from the front of their home. So, Louis "went toward the front door of [his] home . . . . And at that time, right before reaching the front door, [he] heard three more shots." Louis decided to go out the side door of his home into the carport area. He started to walk slowly from behind his Ford Expedition sport utility vehicle ("SUV") toward the front of his house. As he "came from around" the SUV, he saw two men "bolt out of [the complainant]'s front door." Louis "immediately jumped back behind the [SUV]," but not before noting that one man was about five feet, nine inches tall and the other was about six feet tall and holding a handgun. The next thing he heard was "tires screeching" and he saw a Ford Taurus car, "coming from the direction of the complainant's driveway[,] pass in front of [his] house, down the street, and then exit[] out of the subdivision."

After Louis watched the car leave, he asked his wife to call for emergency assistance. He encountered Moore outside in front of his house, and they decided to walk toward the complainant's house. They could see that the front door to the

complainant's home was open. Louis, an attorney and a former state and federal prosecutor, cautioned that they should not go into the home because it probably was a crime scene. They decided to walk toward the house until they reached the middle of the street and called the complainant's name. They "called out his name several times but got no response." Louis saw through the open door that the complainant's dog was sitting in the hall toward the back of the house.

Pearland Police Department ("PPD") Sergeant A. Carroll testified that while he was on patrol on the evening of January 22, 2017, he received a call about a possible home invasion on Windy Shores Drive. When he arrived at the address, he encountered other PPD officers in the front doorway, who told him that they had found the complainant deceased inside the home. Carroll noticed that the front door to the complainant's home "looked like it had been kicked or forced open, based on the splintering." The window beside the front door was broken and pierced with bullet holes. Carroll also noticed fresh damage to the hardwood floor, which looked like a bullet had skipped across it. He saw a bullet hole that went through the couch located in the study area to the left of the front door. The study area looked as if there had been a struggle in it: the area was disheveled, in contrast to the neat and tidy appearance of the rest of the house. Carroll proceeded to the back of the house, where he found the complainant's body lying in a breakfast nook next to the kitchen. The complainant had been shot several times.

4

PPD Detective J. Bond testified that, among other duties as a law enforcement officer, he monitored and accessed the Shadow Creek subdivision's surveillance system to "use as a tool . . . to help solve crimes."[3]  Related to the investigation of the complainant's death, he reviewed the videotaped surveillance recording from the night of January 22, 2017, looking for a Ford Taurus car to match the description given by the complainant's neighbors.  On the recording, he saw the car "traveling northbound" on Reflection Bay, "exiting the neighborhood" at about 7:07 p.m.  Bond accessed the camera view for the license-plate camera and obtained a screenshot of the license-plate number for the car.  He then traced the car's registration to a Jarrett Angst in Needville, Texas.

PPD Detective J. DeSpain testified that he located the Ford Taurus car at Angst's place of employment in Richmond, Texas.  DeSpain entered the building and spoke for about forty-five minutes with Angst, who agreed to accompany DeSpain to PPD headquarters for an interview.  DeSpain interviewed Angst for three and a half hours, then, accompanied by PPD Detective C. Simons, drove Angst to his home in Needville.

When they arrived at Angst's home, Detective DeSpain spoke briefly with Angst's father and got permission to enter the home.  PPD officers also obtained

---

[3]  Detective Bond noted that "[a]nything that involves the roadways in [the] Shadow Creek [subdivision], [law enforcement] ha[s] the ability to look at the camera system."

and executed a search warrant at Angst's home. Angst told one law enforcement officer that a firearm used to kill the complainant was in his bedroom.[4]

Detectives DeSpain and Simons collected a pair of black shorts, a red t-shirt, a pair of black and white Nike shoes,[5] and a black holster containing "a Taurus 9-millimeter pistol with two magazines." The officers also searched Angst's car. Inside the trunk, they found cardboard laid across the interior and a plastic Family Dollar shopping bag containing a dark-colored sweatshirt and pants. The pants were stained with what appeared to be blood near the right pocket and left knee.

Detective DeSpain left Angst's home and returned to PPD headquarters, where PPD Detectives E. Morton and McGuire were interviewing appellant. McGuire left and DeSpain took his place in the interview.

The trial court admitted into evidence a videotaped recording of law enforcement officers' interview with appellant. In the interview, appellant admitted that he and Angst had traveled in Angst's car to Pearland, Texas to kill the complainant. Upon arrival at Windy Shores Drive, appellant approached the complainant's home and knocked on the door. The complainant came to the door and, after a brief exchange, appellant shot a firearm at waist level several times

---

[4]    Detective Simons testified that Angst told him that the firearm found in his bedroom was possibly used to kill the complainant. Simons stated that he found the firearm in Angst's closet.

[5]    According to Detective Simons, Angst stated that he wore these clothes while committing the offense.

through the window on the right side of front door, then shot the door handle and kicked in the front door. At that point, appellant's firearm either jammed or ran out of bullets. The complainant tried to escape down the hall, but appellant caught up to the complainant at the back door, where the complainant was struggling with the doorknob. Appellant dropped his firearm and began punching the complainant in the face. He grabbed the complainant's shoulders, pulled him to the floor, and continued to punch him. When appellant "put [his] knee into [the complainant's] side," his knee became covered in blood, so appellant assumed that he must have struck the complainant with a bullet when he was shooting through the door.

In the meantime, Angst had entered the home and found appellant and the complainant by the back door. Appellant pinned the complainant down on the floor as Angst shot the complainant in the head. After shooting the complainant, appellant and Angst drove to the home of Rita Young, an acquaintance of the appellant, and told her that "it was done." Appellant told law enforcement officers that Young had given him the nine-millimeter firearm that he used to kill the complainant and he left it at the scene.

Appellant also stated that he had never met the complainant before January 22, 2017, but Young had told him that the complainant was the ex-husband of Young's daughter. Appellant told law enforcement officers that Young wanted him to "take care of a problem" involving a child-custody dispute between the

7

complainant and Young's daughter. Young gave appellant the complainant's address, but he could not recall the complainant's name.

Detective DeSpain explained that after he and Detective Morton completed appellant's interview in the early morning hours of January 24, 2017, Morton drove appellant to his home in Needville. The next day, when appellant returned to PPD headquarters for more questioning, DeSpain read him his statutory rights. During the second interview, DeSpain appellant stated that he and Angst had made a "dry run" to the complainant's home the night before the murder.

PPD Detective J. Page testified that he was tasked with reviewing the videotaped surveillance recording from the Shadow Creek subdivision's surveillance system for the night of January 22, 2017. Page located a portion of the recording that showed Angst's Ford Taurus car entering the Shadow Creek subdivision shortly before the offense occurred.

PPD Detective J. Albin, a crime scene investigator, testified that he was charged with collecting evidence from the scene at the complainant's house on January 22, 2017. He recovered shell casings from the flower bed beside the front door of the complainant's home. He found broken pieces of tempered glass where the windows beside the front door appeared to have been shot out. He found a broken cylinder from the front door lock, a bent deadbolt, and a significant gouge in the doorframe. Albin also found scuff marks in the floor where bullets had

8

penetrated the wood. In the study area by the front door, Albin found a small round table knocked over and broken glassware on the floor. He found droplets of blood dotting the floor, a bullet lodged in the floor, and a bullet indentation on the baseboard. He found a hole through a sofa cushion and a bullet lodged in the sheetrock behind the sofa.

Detective Albin also explained that he found the complainant's body next to the kitchen. The complainant had a bullet wound on his neck and blood was pooling underneath his body. Albin noted additional bullet wounds on the complainant's torso and one on his mouth. When Albin rolled the complainant's body over to look at the back, he found a firearm underneath, which had been emptied of ammunition. Near the complainant's body, Albin collected shoe sole impressions from the dried blood on the floor, which were found to match the tread pattern of the tennis shoes appellant wore during the offense. Albin also confirmed that he had collected the pants from the back of the Ford Taurus car that were later the subject of the DNA testing.

Detective Morton testified that, related to the investigation of the complainant's death, he was tasked with finding appellant after Angst mentioned appellant's name during his interview with law enforcement officers. Morton, accompanied by Detectives McGuire and DeSpain, traveled to appellant's home in

Needville on January 23, 2017. They arrived at appellant's home at about 11:00 p.m.

According to Detective Morton, appellant agreed to be interviewed by law enforcement officers at PPD headquarters. As appellant walked to the officers' patrol car, Morton noticed that appellant had what appeared to be blood on his shoes. The officers drove appellant to PPD headquarters, where Morton and Detective DeSpain interviewed him in the early morning hours of January 24, 2017. During the interview, appellant gave the officers his cellular telephone and tennis shoes and provided a DNA sample on a buccal swab.

Appellant also gave law enforcement officers consent to search his cellular telephone. A search of its contents revealed text messages among appellant, Angst, and Young, sent before and after the complainant's death, indicating that the three had planned the offense together. Appellant reiterated that Young gave him the complainant's address.

Detective Morton testified that during appellant's second interview with law enforcement officers, appellant mentioned the parcel of land Young owned in Needville, saying that he "was hoping maybe [he] could do some work for [Young] and end up working off [the price of] her property or something like that." Appellant also remarked, "Even if I could do it for a year, I could get property that would last me a lifetime, go down for generations, [that] I could hand down to my

family." Appellant agreed that "[Young] was fully aware from the beginning that [his] whole purpose was to try to work off—or work up some credit with her so [he] could possibly work a deal with her for her property at a later date." Appellant told law enforcement officers that Young had told him, "If you want compensation[,] I can give you that afterward." Although appellant denied being promised anything specific for killing the complainant, he also said that Young offered to help him later because his girlfriend was pregnant.

Ashley Kibbe, a forensic scientist in the DNA section of the Texas Department of Public Safety Crime Laboratory in Houston, testified in regard to DNA results comparing the complainant's blood sample with DNA extracted from a stain on the right pocket of the pants found in the plastic bag in the back of Angst's car. Kibbe opined that both samples were from a single source.

E. Barnhart, M.D., the Chief Medical Examiner for Galveston, Brazoria, Fort Bend, and Matagorda Counties, testified that she performed an autopsy on the complainant's body. She found the complainant's cause of death to be homicide by multiple gunshot wounds. The complainant's body had eight gunshot wounds. Five of the wounds were potentially fatal: one that passed through the brain and exited through the back of the head; one went into the mouth and exited through the back of the neck; and three passed through the abdomen, perforating the intestine and lacerating the kidney.

11

**Sufficiency of Evidence**

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because he lacked the intent to kill the complainant and his statements about the possibility that his actions were "based on remuneration or the promise of remuneration" are insufficient to support his conviction.

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

In reviewing the legal sufficiency of the evidence, we treat direct and circumstantial evidence equally because circumstantial evidence is just as

12

probative as direct evidence in establishing the guilt of a defendant. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence constitutes "direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven." *Taylor v. State*, 684 S.W.2d 682, 684 (Tex. Crim. App. 1984). And it alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Further, the "cumulative force" of all the circumstantial evidence in a case can be sufficient to support a jury finding of guilt beyond a reasonable doubt. *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006). "Intent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct evidence of the requisite intent is not required . . . ."); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

Relevant to this case, a person commits the offense of murder if he intentionally or knowingly causes the death of another person. TEX. PENAL CODE ANN. § 19.02(b)(1). A person commits the offense of capital murder if he intentionally commits murder under Texas Penal Code section 19.02(b)(1) while in the course of committing or attempting to commit burglary. *See id.* § 19.03(a)(2). A person commits the offense of burglary if he, "without the effective consent of

13

the owner," "enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." *Id.* § 30.02(a)(3).

Appellant asserts that "[t]here is no evidence before the jury [that he] went to or entered [the complainant]'s residence with a requisite intent to murder [the complainant]."

"In a prosecution for capital murder based on burglary, the requirement that a felony be intended is satisfied by the murder of the victim." *Gardner v. State*, 306 S.W.3d 274, 287 (Tex. Crim. App. 2009). Here, appellant admitted that while breaking into the complainant's home, he shot the complainant in the abdomen, and then, after chasing the complainant down the hall, beating him, and pulling him to the floor, he pinned the complainant down while Angst shot the complainant in the head. Chief Medical Examiner Barnhart testified that five of the gunshot wounds that the complainant sustained were potentially fatal, including three that passed through the complainant's abdomen, and caused the complainant's death. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have determined beyond a reasonable doubt that appellant intentionally committed murder in the course of committing burglary.

Appellant also asserts that the evidence does not support a finding that he "caused the death of [the complainant] for remuneration or the promise of

remuneration from Rita Young." *See* TEX. PENAL CODE ANN. § 19.03(a)(3) (providing person commits offense of capital murder if "the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration"). Because sufficient evidence supports a finding that appellant intentionally committed murder in the course of committing a burglary, we need not address appellant's challenge to the sufficiency of the evidence that he committed the murder in exchange for remuneration or the promise of remuneration. *See Gardner*, 306 S.W.3d at 286–87; *see also* TEX. R. APP. P. 47.1.

We hold that the evidence is legally sufficient to support appellant's conviction.

We overrule appellant's first issue.

## Jury Charge

In his second issue, appellant argues that the trial court erred in instructing the jury because the trial court, in its charge, failed to tell the jury that "it must unanimously agree as to the alternative paragraphs alleging what element gives raise to capital murder."

A review of jury-charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error

15

actually exists in the charge, and, second, if error does exist, whether sufficient harm resulted from the error to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

Here, pertinent to this appeal, the trial court instructed the jury:

. . . [I]f you believe from the evidence beyond a reasonable doubt that [appellant], either acting alone or as a party thereto as hereinbefore defined, in Brazoria County, Texas, on or about the 22nd day of January, 2017, did then and there intentionally cause the death of an individual, namely, [the complainant], by shooting [the complainant] with a firearm, and [appellant] was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by [the complainant];

OR

If you believe from the evidence beyond a reasonable doubt that [appellant], either acting alone or as a party thereto as hereinbefore defined, in Brazoria County, Texas, on or about the 22nd day of January, 2017, did then and there intentionally or knowingly cause the death of an individual, namely, [the complainant], by shooting [the complainant] with a firearm, for remuneration or the promise of remuneration from Rita Young, to wit: money from Rita Young;

OR

If you believe from the evidence beyond a reasonable doubt that [appellant], either acting alone or as a party thereto as hereinbefore defined, in Brazoria County, Texas, on or about the 22nd day of January, 2017, did then and there intentionally or knowingly cause the death of an individual, namely, [the complainant], by shooting [the complainant] with a firearm, for remuneration or the promise of remuneration from Rita Young, to wit: real property from Rita Young;

16

Unless you so find beyond a reasonable doubt, or if have a reasonable doubt thereof, you will acquit [appellant] of Capital Murder and next consider whether [appellant] is guilty of Murder.

Appellant depends on *Richardson v. United States* to assert that the trial court's charge to the jury on Texas Penal Code section 19.03(a)(2) and (a)(3) "contain[s] elements of capital murder not merely manner and means," and thus permits a nonunanimous verdict. 526 U.S. 813, 817–19 (1999). According to appellant, because Texas Penal Code section 19.03's "subheadings (a)(2) and (a)(3) constitute two sets of different elements," they "require[] the State upon the request of [appellant] to elect what theory the State would pursue in presenting the charge to the jury."

*Richardson*, the case on which appellant relies, did not involve a capital-murder statute, but rather one for the offense of a continuing criminal enterprise, which, the United States Supreme Court held, required the jury to unanimously find each of the three acts in the "series of violations" that constituted the criminal enterprise. *See* 526 U.S. at 817–19, 824. In contrast, in charging a jury under the Texas-capital-murder statute, the predicate crimes are submitted in the disjunctive. *See Gamboa v. State*, 296 S.W.3d 574, 583–84 (Tex. Crim. App. 2009) (disjunctive charge is permissible in capital-murder cases under "all alternate theories of capital murder" "so long as the same victim is alleged for the

17

predicate murder"; disjunctive submission of any of alternate theories of offense does not violate unanimity requirement).

In reviewing a disjunctive jury charge, we first consider whether the separate application paragraphs contain different criminal acts or whether they merely instruct as to different means of committing a single offense. *See Fullenwider v. State*, 176 S.W.3d 290, 299 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). If the disjunctive paragraphs contain different criminal acts, then the jury must be instructed that it cannot return a guilty verdict unless it agrees unanimously that the defendant committed one of the acts. *Ngo*, 175 S.W.3d at 744. If the disjunctive paragraphs merely inform of different means of committing a single offense, the jury must agree unanimously that the defendant committed one of the acts. *Id*. Thus, if the disjunctive paragraphs merely inform the jury of different means of committing a single offense, then the jury does not have to unanimously agree on which alternative means the defendant used to commit the offense. *Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991); *see also Gardner v. State*, 306 S.W.3d 274, 301–02 (Tex. Crim. App. 2009) (reaffirming *Kitchens*).

All three of the application paragraphs in the trial court's charge instructed the jury to find whether appellant "intentionally or knowingly cause[d] the death of an individual, namely, [the complainant], by shooting [the complainant] with a firearm." The disjunctive language asked the jury to find whether appellant did so

"for remuneration or the promise of remuneration from Rita Young," either for remuneration or the promise of remuneration in cash or real property, or whether appellant "was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by [the complainant]." Under each paragraph, the jury had to find that appellant caused the complainant's death by shooting him with a firearm. The charge, then, required the jury to unanimously agree to a single offense before appellant could be found guilty of the offense of capital murder.

In a recent capital-murder case, the Texas Court of Criminal Appeals rejected the same argument that appellant makes here. *See Thomas v. State*, No. AP-77,052, 2018 WL 739093, at \*23 (Tex. Crim. App. 2018) (mem. op., not designated for publication). In doing so, the court reiterated the rule that, "[t]he jury in a capital[-]murder case need not be unanimous about which of the enumerated underlying felonies the defendant was in the course of committing (or attempting to commit)." *Id.* (citing *Gardner*, 306 S.W.3d at 302); *see also Luna v. State*, 268 S.W.3d 594, 601 (Tex. Crim. App. 2008) (upholding, over jury-unanimity challenge, general verdict that defendant was guilty as charged in indictment where indictment charged, in separate paragraphs, three alternate theories that defendant murdered complainant while committing and attempting to commit the offenses of burglary, robbery, and arson); *Sherrill v. State*, No.

19

01-07-00503-CR, 2008 WL 4670606, at \*9 (Tex. App.—Houston [1st Dist.] Oct. 23, 2008, pet. ref'd) (mem. op., not designated for publication) (holding defendant's rights to due process and jury trial were not violated by jury charge that did not require jury to unanimously agree on which aggravating offense—kidnapping or aggravated assault—elevated his crime to capital murder). The Court of Criminal Appeals in *Thomas* further observed that it has "applied this holding equally to all alternate theories of capital murder in [Texas] Penal Code Section 19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder." 2018 WL 739093, at \*23 (internal quotations omitted).

For these reasons, we conclude that the trial court's charge to the jury did not violate the unanimity requirement but properly instructed the jury to consider the predicate crimes under the capital-murder statute as alternate manners and means. We therefore hold that the trial court did not err in instructing the jury.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Kelly, Landau, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).

21